IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 3, 2021

**STATE OF TENNESSEE v. ANTONIO D. BLAYLOCK**

**Appeal from the Circuit Court for Madison County**
**No. 19-636    Donald H. Allen, Judge**

_____

**No. W2020-00080-CCA-R3-CD**

_____

The Defendant, Antonio D. Blaylock, entered an open plea to multiple charges resulting from a high-speed chase through Jackson, which culminated in an automobile crash injuring the other driver, a collision with a telephone pole, and damage to the front porch of a house. The trial court sentenced the Defendant to an effective sentence of eight years' incarceration. On appeal, the Defendant argues that the trial court erred by denying him probation. After reviewing the record and considering the applicable law, we reverse the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed;**
**Case Remanded**

D. KELLY THOMAS, JR., J. delivered the opinion of the court, in which CAMILLE R. MCMULLEN, J., joined. J. ROSS DYER, J., filed a dissenting opinion.

J. Colin Morris, Jackson, Tennessee, for the appellant, Antonio D. Blaylock.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Jody Pickens, District Attorney General; and Matthew Floyd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

I.    **Guilty Plea**

On August 12, 2019, the Defendant entered an open plea to felony evading arrest, felony reckless endangerment, reckless driving, reckless aggravated assault, leaving the scene of an accident involving injury, misdemeanor evading arrest, driving without a

license, and leaving the scene of an accident involving property damage, with sentencing to be determined by the trial court. Tenn. Code Ann. §§ 39-13-102, -13-103; 39-16-603; 55-10-101, -10-105, -10-205; 55-50-301. The facts underlying the plea, as explained by the State, were as follows:

[O]n October 28th of 2018, deputies with the Madison County Sheriff's Department were dispatched to 116 Baymeadows Drive in reference to underage drinking. While en route, a complain[ant] called back and said that shots had been fired. Deputy Burmeister was first on the scene. He observed multiple cars leaving the area. He blocked the roadway at Henderson Road and River Chase Drive where vehicles could not leave. He observed every vehicle stop but a 2002 silver Jeep Cherokee who continued to turn into a homeowner's yard and turn around. The deputy then cut the vehicle off blocking the roadway to River Chase Drive and Candlewick Drive. The vehicle then turned around again in another homeowner's yard.

The windows in the Cherokee were down. The officers did give verbal commands for the driver to stop his vehicle. He refused to obey the commands and the officer[']s emergency equipment and then turned around the vehicle.

Deputies then turned around and again continued to make a traffic stop. At that time the vehicle refused to stop and headed down Henderson Road towards Old Medina Road.

At the intersection of Henderson Road and Old Medina Road, two other deputies attempted to make contact with the vehicle. The driver then cut through a yard and drove around the deputies onto Old Medina Road headed southbound.

Deputy Reasons was then following directly behind the vehicle and was calling out locations so the other officers could also assist in following the vehicle. While attempting to stop the vehicle, the driver, [the Defendant], reached speeds of 90-plus miles an hour through residential areas and business areas and construction zones. He continued to drive erratically going in and out of oncoming traffic.

The vehicle drove through a red light at the intersection of Campbell and Ridgecrest almost hitting two vehicles. The driver then drove through a construction barricade on South Campbell. While running through the construction zone, the vehicle then ran a red light at the intersection of

- 2 -

Campbell and North Parkway. The vehicle then hit a vehicle turning off of Maple Street onto Campbell where the vehicle then swerved and ran through an electric pole and hit a tree causing the vehicle to go airborne where it then hit the front porch of a house and overturned onto the driver's side at the residence of 149 Campbell Street.

EMS was called at that time to check on the people involved in the crash. Deputy Reasons cleared the Jeep, but no contact with any occupants. He observed a black male jump out of the sunroof of the silver Jeep Cherokee headed west. He was wearing a gray hoodie and blue jeans. Deputies then chased the suspect shouting multiple times, "Sheriff's Department. Stop." The suspect refused to stop and respond to voice commands.

The suspect continue[d] to run onto Pearl Avenue where Deputy Reasons did catch the suspect behind a residence and he was placed under arrest at this time.

Your Honor, the vehicle that [the Defendant] hit was a 2010 Ford Edge. Your Honor, that was driven by the victim, [Taseshalyn Newsom.] She did complain of neck pain and neck injury as a result of the crash which is the reckless aggravated assault.

[The Defendant] once he was taken into custody did ask the officers why did the officers try and pull him over. He then stated that he needed medical attention. EMS did check [the Defendant] and he was cleared.

When running [the Defendant's] information through dispatch, it showed that he was unlicensed. [The Defendant] then stated that there was another person in the vehicle and he was not the driver. No passenger was ever found or observed in the vehicle at the time of the crash. He was transported to the Criminal Justice Complex at that time.

Your Honor, just to be clear, in regards to the two leaving the scenes of an accident, the first leaving the scene of the accident with injury would be the crash with the 2010 Ford Edge, Ms. Newso[m.] He then was able to flee a little bit further distance and the second leaving the scene of an accident was the property damage to where he hit the telephone pole and the house, but then exited the vehicle and ran from the scene.

This all did occur here in Madison County, Tennessee, Your Honor.

## II.     Sentencing Hearing

During the sentencing hearing, the presentence report was received as an exhibit. Ms. Newsom[1] provided a victim impact statement to the presentence report officer, which reflected that the crash "destroyed" Ms. Newsom's car, her only means of transportation. She stated that due to the loss of her car, she lost her job, was forced to withdraw her child from school, and could not attend doctors' appointments. Ms. Newsom said that she "barely [rode] around in a vehicle now," that she was "real nervous," and that she suffered "bad whiplash" and "real bad pains." Ms. Newsom acknowledged that she received medical treatment for her injuries, which was covered by her medical insurance. Ms. Newsom estimated her monetary damages at $19,000 for the loss of her 2010 Ford Edge, $150 for three children's car seats, and $100 for shoes. Ms. Newsom requested that the Defendant serve more than one year in prison, pay restitution, and have no contact with her.

The presentence report officer noted that Jimmy Carmichael, who owned the house with which the Defendant collided at the end of the high speed chase, reported $10,429.44 in damages to the house and loss of rent to his insurance company. The insurance company file reflected that Mr. Carmichael paid a $500 deductible. Mr. Carmichael requested that the Defendant receive probation, pay restitution, and have no contact with him. The parties stipulated at the hearing that the Jackson Electric Authority's loss due to the damaged telephone pole was $3,817.47.

Relative to the Defendant's criminal history, the presentence report officer stated that no prior charges or convictions were found. However, it was noted that the Defendant's driver's license was eligible for reinstatement after having been suspended since October 7, 2016, "due to a truancy law violation." The report contained no information regarding the Defendant's family, education, or health.

The Defendant, who was twenty years old at the time of the hearing, testified on his own behalf, insisting he had just arrived at the party and had not yet exited his vehicle when he heard gunshots and saw people fleeing. He testified that he was "in fear for [his] life" and ran from the police because he "was just trying to make it home." The Defendant averred that if he had known the extent of the damage he would cause, he would have stopped for the police. The Defendant took full responsibility for his actions and apologized to the victims. He stated that he intended to obtain employment in an effort to pay restitution; he noted that he had previously worked for "Ryder's," where he made between nine and ten dollars per hour, but had to quit in order to attend his court dates.

---

[1] The prosecutor noted that they had been unable to contact Ms. Newsom to arrange for her sentencing hearing testimony.

The Defendant stated that he had also previously worked with his uncle at "A&B Driveway," where he earned between five and six hundred dollars per week, and that the uncle was willing to hire him again.

The Defendant testified that he did not graduate high school after he "had a wreck" and "trouble with a teacher." He noted that he completed partial homeschooling and that when he turned eighteen, "they wouldn't allow [him] to come back to school." The Defendant was willing to obtain his GED, although he noted that the school he needed to attend was in Whiteville, Tennessee, and that he was previously trying to obtain transportation to the school.

The Defendant requested that the trial court allow him to serve his sentence on probation and testified he would follow all rules and restrictions imposed by the trial court. Although he did not have a prior criminal history as an adult, the Defendant acknowledged that "a couple of things" happened when he was a juvenile. He stated, though, that he "always completed the probation." The Defendant testified he did not use drugs or drink alcohol.

Sharon Polk, the Defendant's mother, testified that the Defendant lived with her and her husband. She apologized for the Defendant's behavior and emphasized that he was "a good child" who typically did not get into trouble. Ms. Polk testified that the Defendant's father abused her throughout the Defendant's childhood and that the Defendant's exposure to the abuse "had a lot to do with his reaction." She noted that the Defendant had been diagnosed with attention deficit hyperactivity disorder (ADHD), for which he received counseling and was prescribed Adderall. Ms. Polk testified the Defendant never had any trouble with drugs or alcohol and that he did not own a gun. She asked the trial court to place the Defendant on probation and promised to help the Defendant pay his fines and restitution.

The trial court proceeded to question Ms. Polk about the Defendant's juvenile court history, apparently reading from a document that is not present in the record. Ms. Polk acknowledged that the Defendant ran away in 2011 "for a couple of hours" in response to his father's abusing Ms. Polk. She stated that she picked the Defendant up once he was found and that he appeared before a judge in connection with the incident. She did not recall whether the Defendant violated his probation in that case. The court continued to discuss a 2014 case in Madison County related to "Disrupting a meeting or procession." Ms. Polk stated, "That probably was something to do with . . . a class that he had to go through for juvenile[.]" Ms. Polk affirmed that the Defendant was ordered to complete "some kind of treatment or counseling," including "Pathways and QUINCO" and "some work kind of program" after school related to behavioral problems. Ms. Polk stated that the Defendant was "sentenced to alternative school."

The trial court asked Ms. Polk whether the Defendant was under her care during the incidents the court referenced, and she responded affirmatively. The court asked, "And you couldn't make him mind?" Ms. Polk averred that the Defendant's "acting out" stemmed from his having observed his father's abuse rather than Ms. Polk's not being able to "handle him[.]"

The trial court continued reading from the unidentified document, stating that on June 1, 2016, the Defendant had been convicted of theft of property. Ms. Polk responded that the Defendant had been previously "in trouble with some boys," but "that got dismissed." The court stated that "this shows he was convicted and put on intensive probation . . . involving a theft charge. Did he steal a vehicle or something?" Ms. Polk replied, "No, sir. Because the one that got that vehicle[,] that got dismissed." She agreed, though, that the juvenile court attempted to help rehabilitate the Defendant. Ms. Polk agreed that the Defendant's driver's license was suspended in 2016 due to truancy violations. She stated that she did not know the Defendant had taken her car on the night of the offenses, but she denied that he stole it.

After questioning Ms. Polk at length regarding her knowledge of the circumstances of the offenses in this case, the trial court asked her, "You know, how are you going to pay over $25,000 in restitution because I know he can't do it?" Ms. Polk replied, "We'll do it. We can get it done." The court responded, "All right. How much money have you saved since this happened October 27th of last year? How much money have you saved to pay Ms. Newsom[] for her damages or the other victims? How much money have you saved?" Ms. Polk stated that she was in the process of saving money. The court asked how much money Ms. Polk paid to post the Defendant's bond, and she responded that she and some relatives jointly paid $750. The court stated, "So what actions have you taken since that time, since your son did all of these that he's pled guilty to, what have you done as his mother – is he working anywhere now?" Ms. Polk stated that the Defendant had been working for a company that would not give him excused absences for court dates, although the company was willing to hire him "as soon as he gets out." The trial court then questioned Ms. Polk about whether she had insurance on the car the Defendant crashed; she stated that the car was new and that she and her husband were intending to obtain insurance the following Monday.

The trial court questioned the presentence report officer regarding the lack of any health information or a Strong-R assessment in the presentence report. The officer responded that she had the Defendant's completed questionnaire, but due to an oversight on her part, she had not run the computer program to produce the Strong-R assessment. The court noted that it was required to consider the assessment and that it was also relevant to the court's consideration of alternative sentencing. The court continued the hearing until the presentence report officer could complete the assessment; although the court entered

the Defendant's assessment questionnaire as an exhibit, it does not appear in the appellate record.

At the second sentencing hearing about one month later, the trial court noted that the Defendant had requested the court to consider alternative sentencing "like the Day Reporting Center" and that the court had received an "Assessment and Eligibility Report" from the day reporting center by letter dated December 13, 2019. The letter was entered as an exhibit, but does not appear in the appellate record.[2] The court read from the letter that the Defendant was ineligible for placement at the Day Reporting Center because "according to their assessment" he did not have a "severe to moderate substance abuse history" but that he qualified for the "CRC Services[.]" The court noted its unfamiliarity with CRC Services and asked whether Henry Holladay, who was the Corrections Program Director at the Day Reporting Center, was at the courthouse. The presentence report officer responded that Mr. Holladay was attending a holiday party, but that she had called Mr. Holladay and that he was on his way and would be there "in a few minutes." The court responded that it was "not waiting for him." The court discussed that "the assessment just says that he's just not eligible or doesn't meet the requirements for the Day Reporting Center."

The trial court noted that according to the Day Reporting Center assessment, the Defendant "reported to . . . [Mr. Holladay] that this [was] the first time that he ha[d] gotten into trouble. Now that's not exactly true, is it?" The Defendant responded from the defense table that Mr. Holladay asked "how many priors did [the Defendant] have as an adult." The court replied, "Okay. Well, you know, usually when they ask if you've ever been in trouble before that means forever in your life . . . . You told him this is the first time you had gotten into trouble."

Before proceeding, the trial court asked defense counsel if the Defendant wished to proceed or wait for Mr. Holladay to arrive. The court noted, "I was just waiting because you wanted me to consider the Day Reporting Center and I didn't have an assessment and that's the reason I reset it. Again, I'm just going on what his report says that he technically doesn't qualify for the program." The Defendant indicated that he wished to proceed.

The trial court stated that it had considered the presentence report, the principles of sentencing, the arguments of counsel as to sentencing alternatives, the evidence presented during the guilty plea hearing, the Defendant's statement, and his potential for rehabilitation and treatment. The court noted that the State's narrative of the relevant

---

[2] We note that the court referenced an additional version of the presentence report's having been entered as an exhibit. The appellate record contains one copy of the presentence report in the technical record and one copy in an exhibit volume, respectively, and they are identical.

events reflected the nature and characteristics of the criminal conduct. The court then reviewed the applicable enhancement factors and found that the following factors applied: (1) the Defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (3) the offense involved more than one victim; and (6) the personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great. Tenn. Code Ann. § 40-35-114(1), (3), (6). The trial court gave enhancement factors (3) and (6) great weight, noting the Defendant placed multiple lives at risk and caused extensive damage. The court noted that although the Defendant's juvenile convictions did not appear to be felonies, he had previously been in trouble, did not "take advantage of opportunities for rehabilitation," and continued to violate the law as an adult.

In mitigation, the trial court considered the Defendant's youth. Tenn. Code Ann. § 40-35-113(13). After applying and weighing the applicable enhancement and mitigating factors and considering the facts and circumstances of the case, the trial court sentenced the Defendant as a Range I, standard offender as follows:

| Count | Offense | Sentence |
| --- | --- | --- |
| Count 1 | Evading Arrest (D felony) | 4 years |
| Count 2 | Reckless Endangerment (E felony) | 2 years |
| Count 3 | Reckless Driving (B misdemeanor) | 6 months |
| Count 4 | Reckless Aggravated Assault (D felony) | 4 years |
| Count 5 | Leaving the Scene of an Accident Involving Injury (A misdemeanor) | 11 months, 29 days |
| Count 6 | Evading Arrest (A misdemeanor) | 11 months, 29 days |
| Count 7 | Driving Without License (C misdemeanor) | 30 days |
| Count 8 | Leaving the Scene of an Accident Involving Property Damage (C misdemeanor) | 30 days |

The trial court further ordered counts one through three to be served concurrently with each other and counts four through eight to be served concurrently with each other but consecutive to counts one through three, for an effective sentence of eight years. The court also ordered restitution in the following amounts: $19,250 to Ms. Newsom, $500 to Mr. Carmichael, and $3,817.47 to Jackson Electric Authority.

- 8 -

The trial court stated as its greatest concern that the Defendant "really had no regard for [the] lives of other people out there that night." The trial court recounted the "outrageous" circumstances of the offenses and found that society had a "great" interest in being protected from the Defendant's "possible future criminal conduct." The court further found that a sentence of probation would unduly depreciate the seriousness of the offenses. The court also found that it was "important to send a deterrent to other people." The court noted that people who ran from the police put their lives, the lives of other motorists, and the lives of law enforcement officers in jeopardy. The trial court acknowledged that the Defendant testified he was scared when he ran from the police but told the Defendant he needed "to think about other people." The court stated "based upon his juvenile history" and the offenses in the instant case that the Defendant had an extensive criminal history.

The trial court found that the Defendant was not a good candidate for alternative sentencing or "any type of probation." At this juncture, defense counsel noted for the court that Mr. Holladay had arrived. The court responded,

> Well, Mr. Holladay, I've read his report. I've read his recommendations. I do want to say this: I don't think [the Defendant] was very honest. In the assessment when he tells Mr. Holladay he's never been in trouble before then that is certainly not the truth. He has been in trouble before as a juvenile on multiple occasions. I don't think he's a good candidate for that. I don't think he's been very truthful or honest and that reflects poorly upon his potential for rehabilitation.

The trial court also addressed a general issue in which "[so] many young people these days feel like they have a right to run from the police and . . . jeopardize other motorists on the roadway and . . . put law enforcement officers in jeopardy." The court noted its experience that "every week or every month we have new indictments" for felony evading arrest and that the offense had become a "serious problem" in the judicial district. The court stated that "it's about time that people beg[a]n to realize when you decide to run from the police in a motor vehicle especially when you cause damage and injury . . . and then . . . you just keep fleeing, I don't think you deserve probation at that point." As a result, the trial court denied the Defendant's request for probation and ordered him to serve his sentence in confinement. This timely appeal followed.

**Analysis**

On appeal, the Defendant contends that the trial court erred by denying probation or an alternative sentence, arguing that the principles of sentencing, his youth, and his lack of criminal history make him a "proper candidate for probation or at a minimum a proper

candidate for split confinement."[3]  The State contends that the trial court properly exercised its discretion in ordering the Defendant to serve his sentence in confinement.

Tennessee Code Annotated section 40-35-102 states that "[t]he foremost purpose of [the Tennessee Criminal Sentencing Reform Act of 1989] is to promote justice, as manifested by [section] 40-35-103."  Code section 40-35-102(3) also adopts the following principles:

> (3) Punishment shall be imposed to prevent crime and promote respect for the law by:
>
> > (A) Providing an effective general deterrent to those likely to violate the criminal laws of this state;
> >
> > (B) Restraining defendants with a lengthy history of criminal conduct;
> >
> > (C) Encouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs that elicit voluntary cooperation of defendants; and
> >
> > (D) Encouraging restitution to victims where appropriate[.]

Before a trial court imposes a sentence upon a defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts ("AOC") as to Tennessee sentencing practices for similar offenses; (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (h) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report.  Tenn. Code Ann. § 40-35-210(b).  Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed."  Tenn. Code Ann. § 40-35-103(2), (4).

---

[3] The Defendant does not contest the length of his sentences or the trial court's imposing partial consecutive sentences.

Tennessee Code Annotated section 40-35-102(5) states that "convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration." As such, a defendant who is a standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6)(A). "[A] defendant who is being sentenced for a third or subsequent felony conviction involving separate periods of incarceration or supervision shall not be considered a favorable candidate for alternative sentencing." Id. However, a defendant is not entitled to a presumption that he or she is a favorable candidate for alternative sentencing. State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008). Tennessee Code Annotated section 40-35-102(6) is now only advisory. See Tenn. Code Ann. § 40-35-102(6)(D). "Any sentence that does not involve complete confinement is an alternative sentence." State v. Robert Elijah Oxendine, No. M2019-00288-CCA-R3-CD, 2020 WL 704578, at *4 (Tenn. Crim. App. Feb. 12, 2020) (quoting State v. Gregory Tyrone Dotson, No. M2018-00657-CCA-R3-CD, 2019 WL 3763970, at *10 (Tenn. Crim. App. Aug. 9, 2019) (citing State v. Fields, 40 S.W.3d 435 (Tenn. 2001))).

This court reviews a trial court's sentencing determination "related to probation or any other alternative sentence" under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012); see State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See Carter, 254 S.W.3d at 346.

*a. Purposes and Principles of Sentencing*

In this case, the trial court's effective sentence of eight years in confinement for a nineteen-year-old Defendant whose reckless behavior was confined to one incident in which no lives were lost,[4] who did not have a history of violent behavior or felony convictions, and who lacked a history of drug or alcohol abuse, was inconsistent with the purposes and principles of sentencing. Specifically, the Defendant was not a person with

---

[4] We do not intend to minimize the serious physical and financial injuries to Ms. Newsom as a result of the Defendant's colliding with her car during the high speed pursuit.

a lengthy history of criminal conduct who needed to be restrained, and the sentence did not encourage the Defendant's rehabilitation or restitution to the victims. See Tenn. Code Ann. § 40-35-102(3). Moreover, in consideration of the Defendant's youth and history, a sentence of eight years in confinement was not the "least severe measure necessary to achieve the purposes for which the sentence was imposed." Tenn. Code Ann. § 40-35-103(4). Most notably, although the trial court discussed at length the high monetary value of the damage the Defendant caused, even questioning the Defendant's mother about how much money she had saved to assist the Defendant in making restitution payments, the sentence the trial court imposed significantly hindered the Defendant's ability to pay restitution to the victims. See Tenn. Code Ann. § 40-35-102(3)(D). The Defendant testified that two employers were willing to hire him if he were released on probation and that those employers paid nine or ten dollars per hour and five hundred to six hundred dollars per week, respectively; it is unlikely the Defendant has been able to pay any of his restitution while in confinement.

### b. Alternative Sentencing

An offender is eligible for probation if he or she is sentenced to ten years or less and has not been convicted of certain specified offenses. See Tenn. Code Ann. § 40-35-303(a). Although the trial court was required to automatically consider probation as a sentencing option, see Tennessee Code Annotated section 40-35-303(b), no criminal defendant is automatically entitled to probation as a matter of law, see State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997). It is the defendant's burden to establish his or her suitability for full probation. See Carter, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-303(b)). The defendant must demonstrate that probation will "subserve the ends of justice and the best interests of both the public and the defendant." Hooper v. State, 297 S.W.2d 78, 81 (Tenn. 1956), overruled on other grounds, State v. Hooper, 29 S.W.3d 1, 9-10 (Tenn. 2000). Among the factors applicable to probation consideration are the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect upon the defendant; and the best interests of the defendant and the public. State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978).

Relative to alternative sentencing considerations generally, a trial court should consider the following when determining any defendant's suitability:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1).

As a standard offender convicted of Class D and E felonies, the Defendant was a favorable candidate for alternative sentencing. See Tenn. Code Ann. § 40-35-102(6)(A). When determining that the Defendant specifically was not a good candidate for probation, the trial court discussed at length the "outrageous" circumstances of the offenses, including the numerous lives the Defendant endangered during the high-speed pursuit and the physical and property damage to the victims. The court declined to accept the Defendant's averment that he initially fled from the police because he was afraid. The court stated that full probation would depreciate the seriousness of the offenses and noted that in the court's experience, the judicial district had numerous cases involving young defendants fleeing from the police; as a result, the court implicitly found that denying probation would deter other similarly situated individuals. The court considered the Defendant's juvenile record and suggested by its questioning that it was concerned about returning the Defendant to the care of his mother, with whom the Defendant lived when he committed offenses as a juvenile. We agree with the State that the trial court considered the proper factors and that in light of the court's reliance on the aggravated circumstances of the offenses and the need to deter similarly situated individuals, the Defendant was not entitled to full probation.

Relative to other alternative sentences and whether a sentence of full incarceration was the least severe measure necessary to achieve the purposes of sentencing and no greater than deserved for the offenses, see Tennessee Code Annotated sections 40-35-103(2), (4), we note that the trial court was statutorily obligated to consider the AOC's statistical information regarding sentencing practices and that the record is devoid of any indication that the court complied with this duty. See Tenn. Code Ann. § 40-35-210(b)(6).

The 2017-18[5] AOC statistical data on sentencing practices reflected that about sixty-three percent of Range I sentences for Class D felonies were for full probation or split confinement; thirty-seven percent of the sentences were for complete confinement. The trial court ordered the maximum in-range sentence of four years, or forty-eight months, in confinement for each of the Defendant's Class D felony convictions—Count 1, evading arrest in a motor vehicle, and Count 4, reckless aggravated assault. The four-year sentences were ordered to run consecutively and formed the base of the eight-year effective sentence. Relative to the Class D felony sentences, the 2017-18 AOC report reflected that the "mean," or average, sentence for a Range I, standard offender was about thirty-three

---

[5] The 2017-18 report was released in November 2018; the 2018-19 report was not released until March 2020. As a result, the latest available statistical data available to the trial court at the Defendant's December 2019 sentencing hearing was from the 2017-18 report.

months; the "median," or middle number of the set of data, was thirty months. See Administrative Office of the Courts, Sentencing Practices in Tennessee (Nov. 2018). Although the trial court was not mandated to give the statistical information any particular weight, it bears noting that the trial court's sentences in Counts 1 and 4 were higher than average; given the facts of this case, the sentences do not comport with the legislature's directive that trial courts should prioritize the incarceration of "convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society and evincing failure of past efforts at rehabilitation[.]" Tenn. Code Ann. § 40-35-102(5).

Relevant to the Defendant's potential for rehabilitation, the record reflects that the trial court also failed to consider a validated risk and needs assessment. See Tenn. Code Ann. § 40-35-210(b)(8); cf. State v. Ronald Ailey, No. E2017-02359-CCA-R3-CD, 2019 WL 3917557, at *32 (Tenn. Crim. App. Aug. 19, 2019) (concluding that the trial court had considered the presentence report and statistical information adequately when both were entered as exhibits and the court stated multiple times that it would review or had reviewed all the information the defendant had submitted). At the first sentencing hearing, the court addressed the presentence report officer regarding the lack of a Strong-R assessment or any health information in the presentence report. The officer responded that she had the Defendant's completed questionnaire, but due to an oversight on her part, she had not run the computer program to produce the Strong-R assessment. The court entered the questionnaire as an exhibit to the hearing, but it does not appear in the appellate record; the presentence report officer stated that she needed a copy of the questionnaire to complete her task, and it is not obvious from the transcript what happened to the questionnaire. At the second sentencing hearing, the court articulated a mistaken impression that it had continued the first hearing in order to obtain a letter of eligibility from the "day center"; the Strong-R assessment was never addressed by the court, and it was not entered as an exhibit to the second hearing.

A "validated risk and needs assessment" is "a determination of a person's risk to reoffend and the needs that, when addressed, reduce the risk to reoffend through the use of an actuarial assessment tool designed by the department that assesses the dynamic and static factors that drive criminal behavior." Tenn. Code Ann. § 40-35-207(d). Although the trial court must consider the risk and needs assessment in determining a defendant's sentence, "the statute does not mandate that any particular weight be given to the risk and needs assessment, and . . . the weight to be assigned to the assessment falls within the trial court's broad discretionary authority in the imposition of sentences." State v. Christopher C. Solomon, No. M2018-00456-CCA-R3-CD, 2018 WL 5279369, at *7 (Tenn. Crim. App. Oct. 23, 2018) (citing Bise, 380 S.W.3d at 708). In this case, nothing in the record indicates that the trial court considered the Strong-R assessment or that the assessment was ever provided to the court.

Instead, the trial court only briefly considered the Defendant's potential for rehabilitation by finding that the Defendant lied to Mr. Holladay about his juvenile history. At the second hearing, the trial court examined a letter stating that the Defendant was not eligible for day center services because he was not suffering from a moderate to severe drug or alcohol addiction. The letter, which was not entered as an exhibit, also stated that the Defendant denied having been "in trouble" before. The Defendant interjected from the defense table that Mr. Holladay asked him only about adult charges. Mr. Holladay, who was attending a work-related holiday party, was called to court, but the trial court stated that it would not wait for him to arrive. The trial court then asked the Defendant if he wanted to proceed; the Defendant acquiesced. Near the end of the hearing, it was noted that Mr. Holladay had arrived and was available to testify, but the court only responded that the Defendant was not "very truthful or honest" with Mr. Holladay and that it reflected poorly upon his potential for rehabilitation.

Further, relative to the Defendant's history of criminal behavior, it is unclear whether the trial court referred to documents not in evidence at the hearings, as the court's mentioning a theft incident involving a car was not prompted by answers the Defendant or his mother gave during their testimony on direct examination, and the presentence report only referred to prior truancy charges. Utilizing the witness testimony and the presentence report, almost all of the Defendant's prior offenses were for unruly actions resulting from difficult behavior—disrupting school, running away, and truancy. The remaining delinquency adjudication, which was only referenced by the trial court, for misdemeanor[6] theft did not indicate that the Defendant was incapable of rehabilitation, and we note that it could not be used to enhance the Defendant's sentence. See Tenn. Code Ann. § 39-40-114(16) ("The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult").

We further note that the Defendant's criminal history contained far less than the three prior felony convictions specified by statute to denote offenders who are not favorable candidates for alternative sentencing. See Tenn. Code Ann. § 40-35-102(6)(A). We emphasize that the Defendant's juvenile offenses, with the exception of truancy, were not documented at the sentencing hearings, and the behavior to which the Defendant and his mother testified was uniformly nonviolent—running away, disrupting school, and truancy—and did not indicate that he had previously engaged in the same degree of reckless behavior he exhibited in this case. The Defendant also testified that he successfully completed his probation on previous occasions, and he had no history of alcohol or drug abuse. The Defendant's mother and stepfather were supportive and offered to help the Defendant make restitution payments if necessary. As such, none of the

---

[6] The trial court acknowledged during sentencing that the Defendant's juvenile record did not contain delinquency adjudications that would have constituted felony offenses if the Defendant had been an adult when they were committed.

- 15 -

evidence presented at the sentencing hearings was "to the contrary" that the Defendant was a favorable candidate for alternative sentencing. See Tenn. Code Ann. § 40-35-102(6)(A).

In sum, the trial court did not consider the mandated risk assessment and statistical information before imposing the Defendant's sentence; instead, it relied on the Defendant's response regarding his prior record to determine that the Defendant had poor prospects for rehabilitation and concluded that although the victims were entitled to a significant amount of restitution, the Defendant should be incarcerated for eight years instead of being placed under supervised release and working toward paying that restitution. Because the record does not demonstrate that the Defendant's sentence "is otherwise in compliance with the purposes and principles listed by statute" the court's sentencing determination has lost the presumption of reasonableness for purposes of our review. Bise, 380 S.W.3d at 709-10.

We acknowledge that defense counsel allowed these errors to occur without lodging a contemporaneous objection. However, the trial court had an independent statutory duty to consider a risk assessment and any statistical information from the AOC about similar offenses before imposing a sentence. At any rate, this court may at any time "consider an error that has affected the substantial rights of a party[.]" Tenn. R. App. P. 36(b). In this case, the absence of a risk assessment was significant—the Defendant's family situation, juvenile record, and potential to reoffend weighed heavily in the trial court's decision not to grant probation or split confinement. Likewise, the AOC statistics would have assisted the trial court by providing context about sentencing practices for similar offenses; instead, the court imposed the maximum in-range sentence in confinement without considering that the majority of trial courts are imposing shorter sentences and favoring alternative sentencing over imprisonment for standard offenders.

Based upon the circumstances of the offenses, which involved reckless behavior causing serious bodily and financial injury to Ms. Newsom and property damage to Mr. Carmichael's home and a utility pole, and which endangered numerous police officers, motorists, and residents of the areas through which the Defendant drove, we agree with the trial court that a period of incarceration acknowledges the seriousness of the offenses and impresses upon the Defendant and others that such conduct carries consequences. However, our review of the record also indicates that the Defendant is a favorable candidate for split confinement, which allows the State to supervise him and also give him the opportunity to work toward rehabilitation while making restitution payments to the victims. As a result, we order that the Defendant's sentence be modified to reflect one year in confinement and seven years on supervised probation.

### *Conclusion*

Based on the foregoing authorities and reasoning, we reverse the judgments of the trial court and remand the case for entry of modified judgments reflecting an effective sentence of eight years, with one year to serve and seven years on supervised probation.

_____
D. KELLY THOMAS, JR., JUDGE